UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAMES OLDHAM | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-12-2432 |
| | § | |
| THOMPSON/CENTER ARMS COMPANY, INC., | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM AND ORDER

Pending before the Court is Defendant Thompson/Center Arms Company, Inc.'s ("Thompson" or "Defendant") Motion for Summary Judgment ("Motion"). (Doc. No. 62.) After considering the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that the Defendant's Motion should be **DENIED**.

### I.   BACKGROUND

This is a tort case arising out of a hunting accident at Pescadito Ranch in Laredo, Texas on December 26, 2011. (Doc. No. 61-2, Oldham Dep. 28:19–21; Doc. No. 66-1, Oldham Aff. at 3–4[1].) James Oldham's ("Oldham" or "Plaintiff") rifle unexpectedly discharged while he was hunting. (Oldham Dep. 104:13–106:18; Oldham Aff. at 3–4.) As a result of the incident, Oldham is completely and permanently deaf in his left ear. (Oldham Aff. at 4.) He now brings suit against the manufacturer of the rifle, Thompson. The parties do not dispute that the rifle discharged suddenly because of a missing rear trigger housing pin. (*See* Doc. Nos. 62-1 and 66-3, Laney Dep. at 221:1–10, 240:23–241:4.) The dispute centers on whether the rifle left Thompson's possession in that condition.

---

[1] The Oldham Affidavit does not have numbered paragraphs. Accordingly, the Court cites to pages in the affidavit.

Oldham obtained the rifle in question from Thompson when another Thompson rifle Oldham owned, a Triumph .50 caliber Magnum Inline muzzle loader rifle, had exploded in December 2009. (Oldham Dep. 46:18–47:9; Oldham Aff. at 1–2.) Plaintiff's wife had purchased the muzzle loader rifle for Plaintiff as a surprise birthday present. (Oldham Aff. at 1.) In about March 2010, Thompson agreed to provide Plaintiff an ICON medium bolt 30TC caliber action rifle in exchange for signing a release of liability with regard to the muzzle loader rifle. (Oldham Dep. 50:25–51:10; 141:16–142:2.)

Plaintiff's particular rifle was manufactured in May 2008. (Laney Dep. 33:18–36:9.) Although neither party has offered any witnesses who were present during the manufacture and assembly of the specific rifle in question, Thompson has provided detailed evidence of its typical manufacturing process for ICON rifles. Mark C. Laney, the director of research and development at Thompson/Center when the ICON rifle in question was manufactured, testified as to the manufacturing, testing, and inspection process for ICON rifles. (*Id.* at 5:6–10, 12:13–15, 42:1–54:12.) Thompson used a one-piece flow assembly line system, whereby every rifle would be made in a single assembly line to completion. (*Id.* at 43:1–13.) The assembly line would consist of four assemblymen working near each other on closely-spaced benches. (*Id.* at 47:5-15; 52:19-24.) All of the employees on the assembly line would be "cross-trained," so that any of them could move into any part of the assembly line. (*Id.* at 51:1–17.)

The first two people on the assembly line assembled the bolt, the trigger, and the action. (*Id*. at 51:2–17.) Once the trigger, bolt, trigger housing, and action were assembled, the receiver would be placed on a test stock and taken to a shooting tunnel for test-firing. (*Id*. at 51:2–17, 51:24–52:12.) A fifth employee was in charge of function-testing and test-firing at targets. (*Id.* at 46:10–25, 52:4–12.) After the test-firing was completed, the rifle would be brought back to

the assembly line, where an assemblyman would visually inspect and manipulate it and install a finished stock. (*Id.* at 46:10–47:4, 52:7–12.) The rifle would then be cycled, "dummy rounds" would be tested in the magazine, the safety would be inspected and function-tested, and the headspace would be measured with gauges. (*Id.* at 46:10–47:4.) The entire rifle would also be visually inspected for aesthetic purposes before being passed to the final assemblyman, who would place the rifle in the box. (*Id.* at 46:10–47:4, 46:10–47:4, 52:7–12.) Laney testified that the rifle would not have left Thompson's facility without the rear trigger housing pin because it would not have passed the aforementioned test-firing and function tests. (*Id.* at 27:17–28:7.)

When Thompson agreed to provide Plaintiff with an ICON rifle, Ernest French, the customer service manager at the time, also offered to install a custom stock on the rifle. (Doc. Nos. 62-3 and 66-4, French Dep. 4:24–5:12, 12:24–13:1.) In 2010, an assembled ICON rifle was removed from the custom shop area, and a custom, higher-end stock was installed. (*Id.* at 13:7–15:11.) Pursuant to French's instructions, a Thompson employee replaced the factory-installed stock with a custom stock French selected. (*Id.* at 13:7–14:8.) French was not present during the installation, but he testified that he instructed the employee to test-fire and function test the rifle again with the new stock installed. (*Id.* at 14:8–14, 42:11–16.) After testing was completed, French personally inspected the rifle, checking its aesthetics, function, and safety. (*Id.* at 14:20–15:4.) He approved the rifle, and it was prepared for shipment. (*Id.* at 15:5–11.)

Because of restrictions on where firearms could be shipped, Plaintiff arranged to pick up the rifle from a local gun dealer, Northwest Pawn. (*Id.* at 51:13–52:7.) The gun was shipped to Northwest Pawn on or about May 25, 2010, and Oldham retrieved it on or about June 2, 2010. (Oldham Aff. at 2.) A few weeks after picking it up, Plaintiff and his wife took the rifle to a shooting range. (Oldham Dep. 57:2–58:7, 61:20–62:4, 62:18–63:16.) At that time, Plaintiff

3

observed no problems with the functioning of the rifle. (*Id.* at 63:17–22.) However, because Plaintiff's wife, who was going to be the likely user of the rifle, did not like the recoil on the gun, Plaintiff decided to take it to a gunsmith to install a muzzle brake and thicker recoil pad, and to shorten the stock by an inch. (Oldham Aff. at 2; Oldham Dep. 58:6–7, 66:11–22.)

Oldham took the rifle to a local Gander Mountain ("Gander") store to reduce the recoil of the rifle. (Oldham Aff. at 3.) The gunsmith, Jerry Dawkins, conducted a visual inspection upon receipt of the gun, and noted that it was in "as new" condition. (Doc. Nos. 62-3 and 66-6, Dawkins Dep. 34:4–35:18.) As part of the process of installing the muzzle brake, Dawkins attached the barreled receiver, with the trigger group still on the action, to a lathe and rotated the receiver at speeds between 80 and 90 rpms. (*Id.* at 42:24–43:6, 50:8–52:7.) Dawkins testified that, had the rear trigger housing pin been missing at that time, the trigger housing would vibrate and make noise because of a loose part. (*Id.* at 65:19–66:2.) Dawkins explained this would constitute an anomaly, and that he would not reassemble the firearm without determining what caused the anomaly. (*Id.* at 66:2–18.) Dawkins also testified that his ordinary practice was to perform several safety and function tests on a firearm after completing repairs, which would provide another opportunity for identifying any anomalies. (*Id.* at 66:19–67:24, 71:17–72:15.) However, upon subsequent cross-examination by Plaintiff's counsel, Dawkins clarified that a trigger housing pin can be missing, causing the trigger housing to be loose, but not loose enough to rise to the level of a noticeable anomaly. (*Id.* at 138:4–16.) Dawkins also explained that he would not have independently inspected the gun to determine if any pins had fallen out, because he only investigated once he discovered an anomaly. (*Id.* at 64:23–65:18.) He further stated that he never actually confirmed that the rear trigger housing pin was in place. (*Id.* at 94:8–11.)

After Dawkins completed his work, Oldham was advised that the rifle was ready for pick up. (Doc. No. 62-4, Dawkins Dep., Ex. 5.) Oldham picked up the gun on or around August 31, 2010. (*Id.*) Between his retrieval of the gun from Gander and the incident that forms the subject of this lawsuit, Plaintiff and his wife fired the rifle a few more times. (Oldham Aff. at 3; Oldham Dep. 74:23–75:15.) Neither Plaintiff nor his wife noticed any problems with the function of the rifle. (Oldham Dep. 75:19–24.)

On December 26, 2011, Plaintiff travelled to Laredo, Texas to go hunting. (*Id.* at 28:19–21, 79:10–13.) While onboard a truck, with the rifle in a gun rack, Plaintiff loaded the rifle, cycled the bolt, and engaged the safety, at which point the rifle unexpectedly fired. (*Id.* at 84:18–86:6.) Plaintiff then ejected the shell, pointed the gun away from everyone, engaged the safety, and cycled the bolt again. (*Id.* at 86:7–16.) Nothing happened, and Plaintiff concluded that perhaps he had hit the trigger before the safety had fully engaged the first time. (*Id.* at 86:7–16, 86:23–87:17.) He decided to keep using the gun, believing that it was fine because he successfully engaged the safety that time. (*Id.* at 87:11–17.) Later that day, Plaintiff shot a javelina while in a box stand. (*Id.* at 101:2–5, 102:25–105:1.) Because he was not yet sure if the javelina was dead, Plaintiff immediately cycled another round in the rifle. (*Id.* at 108:6–13.) As he was bringing the rifle into the stand and activating the safety, the rifle discharged right next to his left ear. (*Id.* at 105:2-6, 105:17–106:18; Oldham Aff. at 4.)[2] The discharge left Oldham completely and permanently deaf in his left ear. (Oldham Aff. at 4.)

---

[2] It should be noted that, shortly after the incident, Plaintiff made a video reenacting the incident. (*See* Doc. No. 62-5, Video; Oldham Dep. 112:1–4.) According to the video, the gun fired twice with the safety engaged while Plaintiff was in the stand. (*See* Video.) In his deposition, Plaintiff indicated that his present recollection was a more accurate accounting because of the "shell shock" immediately after the incident. (Oldham Dep. 113:9–13.) In his affidavit, he also explained that the video was intended to recreate "the nature of the defect, not the step-by-step chronology of precisely what happened . . . in the deer stand." (Oldham Aff. at 4.)

5

After the incident, the rifle was inspected and it was determined that the rifle was missing a rear trigger housing pin, which affected the function of its trigger and safety mechanisms. (Doc. No. 61-4, Expert Report of James C. Hutton at 5.)  Several other aberrant conditions were noted, including that the screws on the left side of the trigger housing (where the rear trigger housing pin is supposed to be located) were damaged and scratched, suggesting improper application of an Allen wrench.  (*Id.* at 6; Doc. No. 62-1, Hipes Dep. 27:11–14; Laney Dep. 157:1–16.)  Dawkins examined the subject rifle again after the incident, and stated that it was "unlikely" that the rifle left Gander with such markings on the screws, explaining that he would have reapplied cold blue to any marks.  (Dawkins Dep. 77:19–79:8.)

Plaintiff contends that, because the only times the pin in question could have been displaced were when the rifle was disassembled, and because the work Dawkins performed was highly unlikely to dislodge the pin, Thompson must have shipped the rifle without the pin.  (Doc. No. 66, Resp. at 15.)  Plaintiff alleges that Defendant is liable under strict liability, negligence, and breach of implied warranty of merchantability theories.  (Doc. No. 27, Second Am. Compl. ¶¶ 12–17.)

Defendant moves for summary judgment, arguing that the strict liability, negligence, and breach of implied warranty of merchantability theories all fail because there is no evidence that the rifle had any defect when it left Thompson's facility.  (Mot. at 10–13.)  Defendant also moves for summary judgment on the breach of implied warranty of merchantability claim because Plaintiff was not the purchaser of the original gun.  (*Id.* at 13–14.)  Finally, in its Reply, Defendant raises, for the first time, an argument that the breach of implied warranty of merchantability claim must fail because Thompson had explicitly disclaimed all implied warranties.  (Doc. No. 73, Reply at 10.)

## II.   LEGAL STANDARD

To grant summary judgment, a court must find that the pleadings and evidence show that no genuine issue of material fact exists, and that the movant is therefore entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."  *Id.*  If the moving party meets this burden, the nonmoving party must then go beyond the pleadings to find specific facts showing there is a genuine issue for trial.  *Id.*  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citation omitted) (internal quotation marks omitted).

"Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party."  *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 188 (5th Cir. 2007).  Courts may not make credibility determinations or weigh the evidence.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.  Fed. R. Civ. P. 56(e)(1); *see, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir.1996) *see also Liquid Air Corp.*, 37 F.3d at 1075 (noting that a nonmovant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  However, "summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the

7

nonmovant." *Liquid Air Corp.*, 37 F.3d at 1076 (citation omitted) (internal quotation marks omitted). A court should not, in the absence of proof, assume that the nonmoving party could or would provide the necessary facts. *Id.* at 1075.

## III. ANALYSIS

### A. Condition of the Product When It Left Defendant's Possession

When bringing a manufacturing defect claim, whether under a strict liability, negligence, or breach of implied warranty theory, the plaintiff has the burden to show that the product was in a defective condition when it left the hands of the manufacturer. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004) (discussing strict liability); *Shaun T. Mian Corp. v. Hewlett–Packard Co.*, 237 S.W.3d 851, 863 (Tex. App.—Dallas 2007, pet. denied) (same); *Scott v. White Trucks*, 699 F.2d 714, 719 (5th Cir. 1983) (discussing negligence); *Porter v. Eckert*, 465 F.2d 1307, 1306 n.2 (5th Cir. 1972) (discussing negligence and breach of implied warranty of merchantability); *Jack Roach-Bissonnet, Inc. v. Puskar*, 417 S.W.2d 262, 278 (Tex. 1967) (discussing breach of implied warranty of merchantability); *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 853 (Tex. App.—Fort Worth 2005, no pet.) (same).

Both direct and circumstantial evidence may be used to support an inference that the defect existed at the time the product left the manufacturer's possession. *Shaun T. Mian*, 237 S.W.3d at 863; *see also Ridgway*, 135 S.W.3d at 601. However, circumstantial evidence must do more than merely "raise the possibility that the defective condition *could have existed* at that time . . . . [I]t must provide a reasonable basis for concluding that the defective condition *did not arise subsequent* to the manufacturer's exercise of control over the product." *Shaun T. Mian*, 237 S.W.3d at 863. The Texas Court of Appeal has aptly explained when circumstantial

8

evidence may allow an inference that a defect existed at the time the product left a defendant's possession:

> Sometimes this basis can be provided by evidence of the age of the product and its history of usage up to the time of failure. "The age and use of [a] product during the time intervening between [its] purchase and malfunction will tend to support or defeat the circumstantial weight of the malfunction as proof of original defect." *Gen. Motors Corp. v. Hopkins*, 548 S.W.2d 344, 350 (Tex. 1977). New or nearly new products "typically have not been modified or repaired, therefore making a product defect the likely cause of an accident." *Ridgway*, 135 S.W.3d at 601. Thus, an inference of original product defect may be warranted from the malfunction of a relatively new or sealed product. *See Darryl v. Ford Motor Co.*, 440 S.W.2d 630, 631 (Tex. 1969) (three-month-old truck with 600 to 700 miles and no repairs); *Sipes v. Gen. Motors Corp.*, 946 S.W.2d 143, 146, 155 (Tex. App.—Texarkana 1997, writ denied) (sealed airbag system in new car). However, such an inference may not be warranted if the product was worn, misused, damaged, repaired, or altered after it left the manufacturer's control. *See Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 808 (Tex. 2006) (tire with 30,000 miles and nail puncture); *Ridgway*, 135 S.W.3d at 599 (two-year-old truck with 54,000 miles and three repairs to fuel system); *Turbines, Inc. v. Dardis*, 1 S.W.3d 726, 732 (Tex. App.—Amarillo 1999, pet. denied) (allegedly defective valve in 30–year–old aircraft engine).

*Shaun T. Mian*, 237 S.W.3d at 863. Furthermore, where "the defect exists inside an encased mechanism or container, absent the establishment of some necessity to invade the mechanism, the inference is that the defective condition existed at the time of the manufacture[] or assembly." *Sharp v. Chrysler Corp.*, 432 S.W.2d 131, 136 (Tex. Civ. App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.). Generally, "questions of when and where a defect originated should be left to the finder of fact so long as reasonable and well balanced minds (could) be satisfied from the evidence adduced that the defective condition existed when the [product] was delivered." *Williams v. Genie Industries, Inc.*, No. Civ.A. H–03–4579, 2005 WL 1606927, at *5 (S.D. Tex. 2005).

Although Plaintiff has not made an especially strong showing, the Court finds that reasonable minds could conclude that the defective condition existed at the time the rifle left

Thompson's possession. Unlike cases in which Texas courts have concluded that the product was too old and had seen too much use to infer that the product was defective when it left the original seller's possession, the rifle in question had left the Defendant's possession only about a year and a half before the accident. (Oldham Aff. at 2–3.) Furthermore, throughout that time, the rifle had been fired only about twenty times. (*See id.*; Oldham Dep. 58:6–7, 66:11–22, 74:23–75:15.) Such a scenario is easily distinguishable from products that are several years old, and contain serious signs of wear and tear. *See Mendez*, 204 S.W.3d at 808; *Ridgway*, 135 S.W.3d at 599; *Turbines*, 1 S.W.3d at 732; *see also Kuisis v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 336 (Pa. 1974) ("The age of an allegedly defective product must be considered in light of its expected useful life and the stress to which it has been subjected. In most cases, the weighing of these factors should be left to the factfinder.").

Furthermore, Plaintiff is also entitled to the inference from *Sharp* providing that, unless there is a need to invade an enclosed mechanism, the defective condition existed at the time of manufacture. *Sharp v. Chrysler Corp.*, 432 S.W.2d at 136. In *Sharp*, the Texas Supreme Court recognized that Plaintiff was entitled to the inference that a defect in the brake system of a vehicle existed at the time of manufacture because the braking system was an encased unit, despite the fact that the vehicle had been in an accident, because there was no indication that the braking system was compromised as a result of the accident. *Id.* at 135–36. Defendant relies on *Carroll v. Ford Motor Co.*, 462 S.W.2d 57, 61–62 (Tex. Civ. App.—Houston [14th Dist.] 1970, no writ.) to argue that Plaintiff is not entitled to the inference. However, *Carroll* involved a vehicle with a braking system that was known to cause problems and had been taken in for multiple repairs prior to the accident in question. *Carroll*, 462 S.W.2d at 59. Accordingly, in *Carroll*, "there was sufficient necessity or reason for invading the [enclosed brake mechanism]

by a number of repairmen." *Id.* at 62. Under that set of facts, a clear possibility of the "sealed container" being "opened and tampered with any number of times" existed. *Id.* Here, there had been no indication that anything was wrong with the safety mechanism, or any other aspect of the trigger housing, prior to the date of the accident. Rather, Oldham took the rifle to Dawkins to decrease the rifle's recoil, a modification entirely unrelated to the enclosed trigger housing mechanism. (Oldham Aff. at 2; Oldham Dep. 58:6–7, 66:11–22.) Like the car in *Sharp*, and unlike the car in *Carroll*, this rifle had features altered that did not affect the trigger housing, creating no necessity to invade the enclosed mechanism.

Oldham also has put forward sworn testimony that no one, other than Thompson's employees and Dawkins, ever dissembled the rifle, exposing the trigger housing or the rear trigger housing pin. (Oldham Aff. at 3.) Testimony from Laney, French, and Dawkins indicating that the rifle would not have left their possession with such marks, or with a missing trigger pin is some evidence that the defect may have occurred after Thompson possessed the gun. (*See, e.g.*, Dawkins Dep. 65:19–67:24, 71:17–72:15, 77:19–79:8; Laney Dep. 27:17–28:7; French Dep. 13:7–15:11.) If the jury believes testimony from Thompson employees and Dawkins that a rifle would not have left their possession with such markings, then the inference that the rifle was defective when it left Thompson's possession would be rebutted. However, Plaintiff has also put forward evidence from Dawkins that he might not have recognized a loose trigger guard, and an expert's assessment that the marks on the screws could be the result of poor workmanship at the factory. (Dawkins Dep. 138:4–16; Doc. No. 82-1, Pl.'s Supplemental Expert Report at 4.) The jury could conclude, in weighing the evidence of the age and use of the rifle, and of necessity to invade a closed mechanism, and in considering witness credibility, that the rifle left Thompson's factory in a defective state.

11

Defendant's contention that Plaintiff's evidence amounts to nothing more than impermissible inference stacking misunderstands the nature of inference stacking. (*See* Reply at 6–7.) Plaintiff has not relied on any inferences that depend on other inferences. *See Turbines*, 1 S.W.3d at 736 (plaintiff's use of one inference, that the engine's bleed valve must have failed because expert excluded the possibility of malfunction in the other engine systems, as the sole circumstantial evidence supporting another inference, that there was a defect of an unknown type in the bleed valve, was impermissible inference stacking); *see also Shaun T. Mian*, 237 S.W.3d at 864. Here, Plaintiff has not stacked any inferences; rather, he simply points to multiple facts that all support the same inference: limited use of the rifle after receipt suggests the defect existed when it left the manufacturer's possession; the fact that the defect existed inside an enclosed mechanism which there was no need to invade suggests that the defect existed when the rifle left the manufacturer's possession; the fact that the work Dawkins performed would not normally dislodge the rear trigger housing pin suggest that the defect existed when the rifle left the manufacturer's possession. None of these inferences is "stacked" or depend on each other. Rather, they are simply one inference, supported by different facts.

### B. Breach of Implied Warranty of Merchantability

Defendant raises two arguments against Plaintiff's breach of implied warranty of merchantability claim. First, Defendant argues that, because Plaintiff did not buy the original gun, he lacks standing to raise state a claim for breach of implied warranty of merchantability. (Mot. at 13–14.) Defendant also raises, for the first time, in its Reply, an argument that Plaintiff's claim must fail because Thompson disclaimed all implied warranties. (Reply at 10.)[3]

---

[3] "A court generally will not consider arguments raised for the first time in a reply brief." *Pa. Gen. Ins. Co. v. Story*, No. Civ.A.3:03CV0330-G, 2003 WL 21435511, at *1 (N.D. Tex. 2003) (citing *Lacher v. West*, 147 F. Supp. 2d 538, 539 (N.D. Tex. 2001)); *Blanchard and Company, Inc. v. Heritage Capital Corporation*, No. 3:97-CV-690-H, 1997 WL 757909 at *1 (N.D. Tex. Dec. 1, 1997); *Springs Industries, Inc. v. American Motorists Insurance Company*, 137

### *1.  Purchaser of original gun*

"The elements of a cause of action for breach of the implied warranty of merchantability are: (1) *the defendant sold or leased a product to the plaintiff;* (2) the product was unmerchantable; (3) the plaintiff notified the defendant of the breach; and (4) the plaintiff suffered injury." *Polaris Indus., Inc. v. McDonald*, 119 S.W.3d 331, 336 (Tex. App.—Tyler 2003) (emphasis added) (citing Tex. Bus. & Commerce Code. Ann. §§ 2.314, 2.607(c)(1), 2.714, 2.715 (1994)). Defendant argued, in a previous motion to dismiss, that, because the ICON rifle was not sold to Plaintiff, but was rather provided as a replacement, Plaintiff cannot satisfy the first element of the cause of action. (Doc. No. 29, Defendant's Partial Motion to Dismiss Plaintiff's Second Amended Complaint at 12–14.) This Court held that a product provided as a replacement for a purchased product can be considered part of the original sale. (Doc. No. 47, Memorandum and Order at 14–15.) Defendant now argues that, even if the ICON rifle is considered part of the original sale, Plaintiff lacks standing to bring a breach of implied warranty of merchantability claim because he was not the purchaser of the original gun. (Mot. at 13–14.)[4]

The Texas Business and Commerce Code is neutral on the question of "whether anyone other than a buyer may take advantage of an express of implied warranty of quality made to the buyer." Tex. Bus. & Com. Code Ann. § 2.318. The legislature specifically delegated the question to the courts. *See id.* ("These matters are left to the courts for their determination."). The Texas Supreme Court has previously addressed the question of whether anyone other than a buyer can sue for personal injuries arising out a breach of implied warranty of merchantability.

---

F.R.D. 238, 240 (N.D. Tex. 1991)). "However, no 'palpable injustice' exists where the nonmovants are given a chance to respond." *Id.* (citing *Blanchard*, 1997 WL 757909 at *1; *Springs Industries*, 137 F.R.D. at 240). Accordingly, the Court ordered Plaintiff to file a surreply addressing Defendant's argument regarding the purported disclaimer of implied warranties. (Doc. No. 83, Order.) Plaintiff filed such a surreply. (*See* Doc. No. 84, Surreply.)

[4] Defendant previously tried to raise this argument at a hearing on Defendant's Motion to Strike Plaintiff's Third Amended Complaint and to Dismiss Count III. (*See* Doc. No. 57, Order.) Because the parties had not briefed the argument, the Court instructed Defendant that, if it wished the Court to consider this argument, it could brief it in a subsequent motion. (*Id.*)

*See Garcia v. Tex. Instruments, Inc.*, 610 S.W.2d 456, 463–65 (Tex. 1980).  The Court held that "privity of contract is not a requirement for a Uniform Commercial Code implied warranty action for personal injuries." *Id.* at 465.  It held that "privity of contract is not a requirement for a Uniform Commercial Code implied warranty action for personal injuries." *Id.* at 465; *see also Ackermann v. Wyeth Pharmaceuticals*, 471 F. Supp. 2d 739, 744 (E.D. Tex. 2006) (stating that "no privity of contract is required in a suit for personal injuries, i.e. whether analyzed as horizontal or vertical privity"); *cf. Keith v. Stoelting, Inc.*, 915 F.2d 996, 999 (5th Cir. 1991) (concluding that Texas courts would not likely extend "recovery for economic loss in personal injury cases such as *Garcia* to persons lacking horizontal privity.").  Even taking the narrow view that Texas state courts would, at a minimum, require horizontal privity, Plaintiff may raise a claim for breach of implied warranty of merchantability because he is in horizontal privity with his wife, the purchaser of the original gun.  *Garcia*, 610 S.W.2d at 463–64 ("'Horizontal privity' describes the relationship between the original supplier and any non-purchasing party who uses or is affected by the product, such as the family of the ultimate purchaser or a bystander.").

Defendant cites some case law for the proposition that privity of contract is required to sue for breach of implied warranty of merchantability. (*See* Mot. at 13–14 (citing *Bossier Chrysler Dodge II, Inc. v. Rauschenberg*, 201 S.W.3d 787, 797 (Tex. App.—Waco 2006), rev'd in part on other grounds, 238 S.W.3d 376 (Tex. 2007); *Woodhouse v. SanofiAventis U.S. LLC*, No. EP–11–CV–113–PRM, 2011 WL 3666595, at *6 (W.D. Tex. June 23, 2011)).  The *Rauschenberg* court stated as follows:  "To have standing to sue for breach of express or implied warranties for goods, the plaintiff must be a 'buyer' of those goods as that term is defined by the UCC.  Section 2.103(a)(1) of the Business and Commerce Code (the Texas UCC) defines a 'buyer' as a 'person who buys or contracts to buy goods.'" *Rauschenberg*, 201 S.W.3d at 797.

14

*Rauschenberg* relied on *DaimlerChrysler Corp. v. Inman*, 121 S.W.3d 862, 882 (Tex. App.—Corpus Christi 2003, pet. granted) for this point of law. 201 S.W.3d at 797. *DaimlerChrystler*, in turn, relied only on a provision of the Texas Business and Commerce Code discussing a buyer's right to sue for non-conformity of tender. *DaimlerChrysler*, 121 S.W.3d at 882 (citing Tex. Bus. & Com. Code Ann. § 2.714). Based on this provision, the *DaimlerChrysler* court concluded that only buyers may sue for breaches of warranty. *Id.* It never acknowledged, however, Texas Business and Commerce Code § 2.318, which specifically reserved the question of whether contractual privity was required to sue for a breach of implied warranty of merchantability for the courts. It similarly failed to discuss the Texas Supreme Court's decision in *Garcia*, holding that privity was not required to sue for a breach of implied warranty of merchantability. *Garcia*, 610 S.W.2d at 465. The only other case Defendant cites in support of its argument that only buyers may bring a breach of implied warranty of merchantability claim, *Woodhouse v. SanofiAventis U.S. LLC*, relied on *Rauschenberg* and *DaimlerChrysler*. *Woodhouse*, 2011 WL 3666595, at *6. Accordingly, the Court concludes that the case law Defendant relies upon does not accurately reflect governing Texas law on whether anyone other than a buyer may sue for breach of implied warranty of merchantability.

    2.  *Disclaimer of implied warranties*

  The Texas Business and Commerce Code provides that "to exclude or modify the implied warranty of merchantability or any part of it [the disclaimer] must mention merchantability and in case of a writing must be conspicuous . . . ." Tex. Bus. & Com. Code Ann. § 2.316(b). In its Reply, Defendant attached what appears to be a portion of a firearm manual, containing a limited warranty. (Doc. No. 73-1, Manual Excerpts.) The limited warranty provides as follows: "THIS WARRANTY IS EXCLUSIVE AND IS GIVEN IN LIEU OF ANY AND ALL OTHER

WARRANTIES, EXPRESS OR IMPLIED. NO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE GIVEN AND ANY AND ALL LIABILITY FOR BREACH OF ANY IMPLIED WARRANTY OR WARRANTY CREATED BY LAW IS DISCLAIMED." (Manual Excerpts at 28.)

However, under Texas law, in order for a disclaimer of an implied warranty to be valid, it must "be communicated, in the manner described in section 2.316(b), to the buyer before the contract of sale has been completed." *Womco, Inc. v. Navistar Int'l Corp.*, 84 S.W.3d 272, 279 (Tex. App.—Tyler 2002, no pet.); *see also Klo–Zik Co. v. General Motors Corp.*, 677 F. Supp. 499, 508 (E.D. Tex. 1987). If a disclaimer is not disclosed to the buyer before the contract of sale has been completed, unless the buyer later agrees to the disclaimer as a modification of the contract, it is not effective. *Dewayne Rogers Logging, Inc. v. Propac Indus., Ltd.*, 299 S.W.3d 374, 391 (Tex. App.—Tyler 2009, pet. denied). Defendant has put forward no evidence to explain when, if ever, Plaintiff was presented with the limited warranty. Indeed, Defendant has merely attached the limited warranty to its Reply, explaining nothing about the circumstances in which Plaintiff received notice of any limited warranty. Accordingly, the Court cannot determine if the manual was provided before Plaintiff signed a release of liability in exchange for receipt of the ICON rifle, or if Plaintiff agreed to it the disclaimer as a subsequent modification to the parties' agreement.

## IV.    CONCLUSION

For the reasons discussed in this order, Defendant's Motion for Summary Judgment (Doc. No. 62) is **DENIED**.

16

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 7th day of August, 2013.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE